UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA NOVAK and PATRICK NOVAK, as the heirs and representative of the decedent, Michael Robert Novak,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF MADERA, a municipal entity of the State of California, et al.,<br><br>Defendants. | No. 1:20-cv-00301-KES-SKO<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO THE FEDERAL CLAIMS, AND DECLINING TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THE REMAINING STATE LAW CLAIMS<br><br>Doc. 30 |

Plaintiffs Lisa Novak and Patrick Novak allege that City of Madera police officers Anthony Martinez, Robert Mahoney, and Dorian Lasso used excessive force when they fatally shot Michael Novak ("Novak"), their brother, on February 7, 2019, when Novak exited his vehicle and approached the officers while brandishing a knife.  Doc. 30.

Plaintiffs bring claims under both 42 U.S.C. § 1983 and state law against defendants Martinez, Mahoney, Lasso, and the City of Madera.  Doc. 22.[1]  Plaintiffs allege the individual defendants used excessive force and wrongfully caused Novak's death in violation of the Fourth, Fifth and Fourteenth Amendments.[2]  *Id.*  They allege the City of Madera is liable based on its

---

[1] Plaintiffs First Amended Complaint ("FAC"), Doc. 22, also asserted claims against officer Kayla Clark, but the parties stipulated to dismissal with prejudice of plaintiffs' claims against Clark and she is no longer a defendant in this action.  Docs. 28–29.

[2] Plaintiffs' § 1983 claim also asserted that defendants violated Novak's right to equal protection under the Fourteenth Amendment, and a right to be free from interference with a zone of privacy

1

express policies and customs and its ratification of the officers' use of force. *Id.* Plaintiffs also allege state law claims for negligence, battery, wrongful death, and violation of California Civil Code § 52.1 ("Bane Act"). *Id.* Defendants moved for summary judgment on all claims, which plaintiff opposed. Docs. 30, 36. The Court took the motion under submission. Doc. 31.

For the reasons addressed below, defendants' motion for summary judgment is granted as to plaintiffs' federal claims under § 1983. The Court declines to exercise supplemental jurisdiction over the remaining state-law claims.

## I.      **Background**

The record, viewed in the light most favorable to plaintiffs, shows the following[3]:

On the evening of February 7, 2019, while on patrol in their police vehicle, defendants Mahoney and Martinez heard dispatch report a reckless or possibly intoxicated driver driving northbound on Highway 99 in Madera, CA. Doc. 30-1, Joint Statement of Undisputed Material Facts ("JSUMF") Nos. 1–3, 6. Mahoney drove towards the location of the call for service. *Id.* No. 4. While seated inside their vehicle, Martinez and Mahoney saw Novak's vehicle cause a traffic collision as it exited a Highway 99 off-ramp. *Id.* No. 5. Novak crashed into another vehicle on Cleveland Avenue in Madera. *Id.* No. 6.

Mahoney activated the police car's emergency lights and drove towards the accident. *Id.* No. 7. Mahoney and Martinez were the first officers to arrive on the scene. *Id.* Upon arriving, Martinez spoke first to Novak, who was still seated behind the steering wheel of his car. *Id.* No. 9. Based on this interaction, Martinez believed that Novak was intoxicated. *Id.* No. 10.

under the Fourth and Ninth Amendments. *See* Doc. 22. But in their opposition to defendants' motion for summary judgment, plaintiffs do not address these arguments. The crux of plaintiffs' § 1983 claims is their allegation that defendants used excessive force against Novak and thereby wrongfully caused his death. Plaintiffs have abandoned any equal protection or zone of privacy arguments with respect to their § 1983 claims by failing to address them in their opposition to the summary judgment motion. *See Momox-Caselis v. Donohue*, 987 F.3d 835, 842 (9th Cir. 2021) (deeming arguments not raised in opposition to summary judgment motion waived); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir. 2001) (holding that district court need only consider arguments and facts set forth in motion papers).

[3] The parties agreed to an extensive Joint Statement of Undisputed Material Facts, which is cited below. *See* Doc. 30-1. Much of the following interactions are also captured on the officers' body cam videos. *See, e.g.*, Doc. 30-2 at Exs. D, E.

2

Mahoney and Martinez asked Novak several times to roll down his window, but Novak repeatedly replied "No." Doc. 30-2, Ex. D; Doc. 30-1, JSUMF, Nos. 11–12. Novak then said, "If you want to shoot me, shoot me." *Id.* No. 13. Mahoney responded, "No one is shooting you. Just get out of the vehicle and make it easier on yourself." *Id.* No. 14. Novak replied, "No, no." *Id.*

Mahoney then asked Novak, "What is the problem?" and "What's going on?" *Id.* No. 15–16. Novak continued to reply, "No." *Id.* During this time, defendant Lasso arrived on the scene and took a position on the passenger side of Novak's car. *Id.* No. 19. Novak made a movement inside the car, prompting Mahoney to ask, "Hey, what are you doing?" *Id.* Nos. 17, 20. Mahoney then told Novak, "Look your car is not going anywhere. You may as well get out." *Id.* No. 21. Novak replied, "Forget it." *Id.* Mahoney then asked, "Do you need an ambulance? *Id.* No. 22.[4]

The above interactions all occurred within less than a minute after the officers arrived at Novak's car. At that point, body cam video then shows Novak reaching for something in the car. *See* Doc. 30-2, Ex. D. In response, Mahoney asked Novak, "Hey, where are you reaching?" *Id.* No. 22. Multiple officers then yelled, "Quit reaching around! Quit reaching around!" *Id.* No. 24. Mahoney suddenly saw that Novak was holding a knife and yelled, "He's got a knife! Drop the knife! Drop the knife!" *Id.* No. 27. Approximately 64 seconds elapsed from the point when Martinez first contacted Novak at the car door after arriving at the scene until Novak pulled out the knife. *Id.* No. 75.

In response, Mahoney backed away and drew his service firearm. Doc. 30-2, Ex. D; Ex. 30-1, JSUMF No. 28. Officers then repeatedly yelled, "Drop the knife"; Novak did not comply and instead tapped the knife against the window of his vehicle. Doc. 30-2, Ex. D; Ex. 30-1, JSUMF No. 29. Martinez said to the other officers, "Chill, relax. Hey, slow down. Watch crossfire. Slow down. Watch crossfire." *Id.* No. 30. Mahoney again warned Novak, "Drop the knife." *Id.* No. 31. Mahoney then told his colleagues, referring to children who had been in the back seat of the car that Novak struck in the traffic accident, "Get those kids out of

---

[4] During this time, Mahoney noticed that Novak had a runny nose with the appearance of a white substance. *Id.* No. 25.

3

there. Are they out of there?" *Id.* No. 31.  Martinez said, "Yeah. Hey, watch the backdrop. Hey. Go over there and make sure they are under cover, please? Make sure. Watch all the backdrop stuff." *Id.* No. 32.  Mahoney again repeated to Novak, "Drop the knife, sir." *Id.* No. 33.

Martinez then said, "Okay, relax. He's a threat to himself right now. Hang on. Relax. Relax." *Id.* No. 34.  Martinez then asked for a taser, stating "Hey, who got less lethal? You got taser? Less lethal, taser?" *Id.*  Lasso replied, "No." *Id.* No. 35.  Unfortunately, neither Martinez, Mahoney, nor Lasso had a taser on them. *Id.*  While Martinez warned the other officers to get out of the way and watch out, Mahoney again told Novak to "Drop the knife." *Id.* Nos. 45–46. Meanwhile, Novak continued to tap his knife against the driver side window and some officers saw him trying to stab himself.  Doc. 37, Plaintiffs' Statement of Disputed Facts ("PSDF") Nos. 10–11.

Approximately 63 seconds after he took out his knife, Novak exited his driver's side door while holding the knife in his hand by the handle, as Mahoney yelled, "Do you see my gun? Drop the knife." Doc. 30-1, JSUMF Nos. 47, 50, 76; Doc. 30-2, Ex. D.  The blade was 6.5 to 7 inches long. *Id.* No. 50.  Novak started walking toward the officers, holding the knife outstretched with the blade pointed towards them and yelling, "Shoot me!" Doc. 30-1, JSUMF Nos. 49, 51, 53; Doc. 30-2, Ex. D.  In response, Martinez yelled, "Stop! Back up!" Doc. 30-1, JSUMF No. 54.  Mahoney also yelled, "Stop! Stop right there!" *Id.* No 55.  But Novak continued towards the officers as they ordered him to stop and drop the knife. *Id.* Nos. 53, 57.  Officers also called out asking for a taser. *Id.* No. 58.  Lasso said "Tase him" four times. *Id.* No. 59. Mahoney, Martinez, and Lasso backed away from Novak until they were within several feet of Lasso's parked vehicle behind them. *Id.* No. 60.

From the time Novak exited his vehicle to the point when the first shot was fired, 11 seconds elapsed. *Id.* No. 77.  In that time, Novak appears to have covered several car lengths in distance, approaching the officers as they backed up. *See* Doc. 30-2, Exs. D, E.  As Novak neared the officers with the knife outstretched in his right hand, Lasso, Bushey, Martinez, and Mahoney fired shots at Novak.  Doc. 30-1, JSUMF Nos. 61, 62; Doc. 30-2, Ex. D.  Bushey and Martinez each fired three shots, and Mahoney fired two shots.  Doc. 30-1, JSUMF No. 63.  The parties do

4

not specify how many shots Lasso fired.  The shots were fired within approximately two seconds.  *See* Doc. 30-2, Ex. D.  Novak was shot a total of nine times and he died at the scene.  Doc. 37, PSDF Nos. 48.

Officers Kayla Clark and Steve Boehm arrived on the scene as the incident was underway.  *Id.* Nos. 38, 40, 44.  Clark had a taser on her, but the parties agree "she was not in a position to use it" as she did not get close enough before the shooting occurred.  *Id.* No. 68.  Martinez had asked Boehm to retrieve a less lethal weapon from Boehm's patrol car, and Boehm headed to his car to retrieve his bean bag shotgun, but the shooting occurred before he could retrieve it.  *Id.* Nos. 41, 42, 43.  Sergeant Bushey also arrived on the scene as the incident was underway.  Bushey had a less lethal bean bag shotgun in his patrol car, but the parties agree that by the time he arrived he would not have had enough time to make use of the beanbag shotgun.  *Id.* Nos. 71–72.

Although Lasso had apparently been dispatched to Novak's residence earlier that evening on a different call, it is undisputed that "[n]one of the officers involved recognized Novak," that "[n]one were aware that Novak had prior contact with [the Madera Police Department]," and that the officers "had no knowledge of his alleged mental illness."  Doc. 30-1, JSUMF No. 65.  Lasso had been dispatched to Novak's home at 8 p.m. that evening, after Novak told dispatchers that he had been followed by a couple of subjects who possibly jumped into his backyard.  *Id.* Nos. 78–79.  Prior to Lasso's arrival at Novak's house, Novak cancelled the call.  *Id.* No. 80.  When Lasso nonetheless responded to investigate, Novak reported that he was inside his locked house and he no longer wanted police assistance.  *Id.* No. 81.  Lasso contact his sergeant, who told him to check and clear the area, which Lasso did.  *Id.* No. 82.  Lasso determined that there was no intruder and nothing from the dispatch call led Lasso to believe that Novak was paranoid or delusional.  *Id.* No. 84.  Neither Lasso nor any other officer recognized Novak at the car crash scene.  *Id.* No. 65.

## II.    Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

5

"genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The Court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The nonmoving party's version of the facts need not be credited if it is blatantly contradicted by video evidence. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If "the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984; *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) ("[T]he moving defendant bears the burden of proof on the issue of qualified immunity.").

If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses and "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

In the endeavor to establish the existence of a factual dispute, the nonmoving party need not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.  But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

**III.    Discussion and Analysis**

**A.  Section 1983 Claims**

Plaintiffs assert that the individual defendants used excessive force against Novak, wrongfully causing his death.  Plaintiffs assert that the City of Madera is liable under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), based on its policy, custom or practice, and because it ratified the officer defendants' actions.  To succeed on a § 1983 claim, plaintiffs must demonstrate (1) "that a right secured by the Constitution or laws of the United States was violated," and (2) "that the alleged violation was committed by a person acting under the color of State law." *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  Defendants do not dispute that Martinez, Mahoney, and Lasso's actions were under color of state law.

Defendants argue that Martinez, Mahoney, and Lasso's actions do not constitute excessive force under the Fourth Amendment and that defendants are entitled to qualified immunity.  Doc. 50 at 12.  As whether the officers violated Novak's constitutional rights is a part of the qualified immunity analysis, the Court turns to the qualified immunity issue.  Qualified immunity shields "government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)).  The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*

An officer may be denied qualified immunity if "(1) the [evidence], taken in the light most favorable to the party asserting injury, show[s] that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood her conduct to be unlawful in that situation."  *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.  The Court first addresses whether defendants violated Novak's constitutional rights.

### 1.  Excessive Force Claim

#### i.  Constitutional Violation

The "use of force to effect an arrest" is examined "in light of the Fourth Amendment's prohibition on unreasonable seizures," and it is "measured by the standard of objective reasonableness."  *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001).  This standard requires courts to decide "whether the totality of the circumstances justified a particular" use of force.  *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).  The Ninth Circuit has held that "summary judgment should be granted sparingly in excessive force cases."  *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014) (citing *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011)).

Relevant factors in "assessing whether an officer's use of force was objectively reasonable include 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Gonzalez*, 747 F.3d at 793 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "The immediacy of the threat posed by the suspect is the most important factor."  *Id.* (citing *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc).  "These factors are not

8

exclusive, and we consider the totality of the circumstances." *Gonzalez*, 747 F.3d at 793–94 (citing *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). Courts evaluate these factors from the perspective of the officers at the time of the incident, without the benefit of 20/20 hindsight. *See Gonzalez*, 747 F.3d at 794. "The factors that justify the use of force must be weighed against the degree of intrusion posed by the particular type of force to determine if the use in the particular instance was reasonable." *Nelson*, 685 F.3d at 883.

Here, the "nature and quality of the intrusion" by the defendants on Novak's Fourth Amendment interests were "extreme." *See A. K. H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (citing *Garner*, 471 U.S. at 8). "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual and of society, in judicial determination of guilt and punishment.'" *A. K. H.*, 837 F.3d at 1011. "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (emphasis omitted) (quoting *Garner*, 471 U.S. at 3).

The facts of this case are similar to those in *Hart v. City of Redwood City*, 99 F.4th 543 (9th Cir. 2024), in which the Ninth Circuit found the officer's conduct to be objectively reasonable under the circumstances. In that case:

> [O]fficers [] responded to a tragic call involving a man attempting suicide with a knife in his backyard. When they arrived, they found the man's wife covered in blood and frantically pleading for help. At her urging, the officers went to the backyard, where they found Hart holding a knife. They told him to drop the knife, but instead of doing so he began moving towards them while raising the knife. As Hart neared the officers, [an officer] deployed her taser, but it was ineffective. With Hart approaching closely and wielding a knife, [another officer] took action to protect himself and his partner,

9

shooting Hart.

*Hart*, 99 F.4th at 545.

In concluding that the officers' conduct was objectively reasonable, the Ninth Circuit focused on several key circumstances similar to those in this case. Notably, Hart briskly walked towards the officers with a knife, going from "thirty feet away to eight or ten feet away" in around 6 seconds. *Id.* at 546. Hart failed to respond to or comply with the officer's command to "drop the knife" and instead continued to approach the officers, holding the knife out towards them. *Id.* at 550. The Ninth Circuit found that the "immediacy of the threat posed by Hart as he approached with a knife [was] dispositive." *Id.* at 552.

In this case, Novak similarly posed an immediate threat to the officers when he continued to approach and close in on the officers while brandishing the knife at them, even though the officers had backed up several car lengths to retreat from him and had repeatedly ordered Novak to stop and to put the knife down. The undisputed record shows that (i) Novak wielded a 6.5-inch blade knife from the moment he exited the vehicle, (ii) Novak closed the gap and came within close range of the retreating officers within eleven seconds, (iii) Novak failed to comply with the officers' repeated commands to stop and to drop the knife, and (iv) while approaching the officers, Novak was holding the knife in his extended arm with the blade pointed towards the officers.

Plaintiffs argue that Novak's "knife gestures were not those of an attack, but a strange back-and-forth wave." Doc. 36 at 13. But the parties' undisputed facts state that "Novak held the knife blade pointed towards the direction of the officers," and that "Novak stepped towards the officers with his arm outstretched with the knife facing the officers." Doc. 30-1, JSUMF Nos. 51, 53. The body camera footage shows that Novak was pointing the knife towards the officers at the moment of the shooting. *See* Doc. 30-2, Ex. E, at 1:25–1:32. A reasonable officer in these circumstances would have perceived Novak's conduct as an immediate threat. In *Hart*, the Ninth Circuit found "a non-responsive individual approaching while holding out a knife is *unarguably* an immediate threat." *Id.* at 552 (emphasis in original). This factor, "which is the most important single element of the three specific [*Graham*] factors," supports a finding that the officers'

10

conduct was objectively reasonable under the circumstances. *Id.*[5]

The other *Graham* factors also support the conclusion that the officers' conduct was reasonable under the circumstances. Approaching officers "while wielding a knife and refusing commands to drop it," may have "constituted an assault on the police officers," *Hart*, 99 F.4th at 552 (citing Cal. Penal Code §§ 217.1, 240). By willfully resisting the officers' commands to drop the knife, Novak may have also resisted arrest, and he did so while exhibiting a deadly weapon, "both of which are also crimes in California." *Id.* (citing Cal. Penal Code §§ 148(a), 417.8). As this "contributed to the immediacy of his threat" to the officers, "the second *Graham* factor does not weigh against the reasonableness of the use of force." *Hart*, 99 F.4th at 553; *see Ames v. King Cnty., Washington*, 846 F.3d 340, 348–49 (9th Cir. 2017) (finding that severity of crime factor weighs in officer's favor when the crime, even if minor in nature, prolongs or exacerbates an ongoing emergency).

Another factor is whether Novak resisted. Resistance is not "a binary state," but rather, "runs the gamut from the purely passive protestor who simply refuses to stand [at an officer's command], to the individual who physically assault[s] [an] officer." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). "[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* Here, Novak was not simply holding a knife, nor did he remain in his car. Instead, he left his car and quickly approached the officers with the knife outstretched toward them as the officers backed up, and he repeatedly failed to comply with the officers' commands to stop. *See Hart*, 99 F.4th at 553 (noting that holding knife and refusing officer's commands while approaching officer amounted to active resistance).

Other relevant factors in the balancing include "the availability of less intrusive force" and "whether proper warnings were given." *Hughes v. Kisela*, 862 F.3d 775, 780 (9th Cir. 2016), *rev'd on other grounds*, 584 U.S. 100 (2018). Plaintiffs argue that the officers could have better

---

[5] *See also Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force."); *Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a weapon does justify the use of deadly force.").

11

equipped themselves to deploy less lethal measures, such as with bean bag shotguns and tasers, and that they could have taken cover in the event the less lethal measures were ineffective. Doc. 36 at 13. But defendants were calling for and trying to obtain less lethal force options, including again calling for the use of a taser after Novak exited the car. *See* Doc. 30-1, JSUMF Nos. 34, 35, 58, 59. The defendants also backed up some distance, yelling commands at Novak to stop, while Novak closed the distance between them. None of the defendants had a taser on them, and the parties agree that another officer who arrived, Clark, "was not in a position to use" her taser as she did not get close enough before the shooting. *Id.* No. 68. And while Martinez had dispatched another officer to get a bean bag shotgun from that officer's patrol vehicle, the officer was not able to retrieve it in time. *See id.*, JSUMF Nos. 41, 42, 43.[6]

In *Hart*, in finding that this factor weighed in favor of the defendant officer, the Ninth Circuit distinguished *Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018), a case in which officers "had upwards of 15 minutes to create a perimeter, assemble less-lethal means, coordinate a plan for their use of force, establish cover, and arguably, try to communicate with Vos." *Vos*, 892 F.3d at 1034. The Ninth Circuit noted that in *Hart* the officers were responding to an emergency situation in which time was of the essence, having only "seventeen seconds from when they arrived on the scene until Hart advanced towards them with a knife." *Hart*, 99 F.4th at 556.

---

[6] Plaintiffs filed a declaration from their police practices expert, *see* Doc. 38, but they do not address this declaration in their opposition. It is not the role of the court to "scour the record in search of a genuine issue of triable fact"; the court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In any event, the declaration does not create a genuine dispute as to a material fact precluding summary judgment. While the expert opines that "[t]he lethal use of force in this case was the result of negligence and recklessness of defendant [Madera Police Department] and the individual police officer defendants," that is a bare legal conclusion and does not establish a constitutional violation. To the extent the declaration asserts that defendants "squandered 63 seconds between the moment the defendant officers realized Mr. Novak was seated in the car holding [] the knife, and the time Mr. Novak exited the car with the knife," Doc. 38 at 3, that conclusion is inconsistent with the parties' joint statement of undisputed material facts, which reflect that the officers were calling for and trying to obtain less lethal force options during that time, and that, unfortunately, Novak removed that option by exiting his car and moving quickly toward the officers with the outstretched knife before a less lethal option became available. *See* Doc. 30-1; Doc. 30-2 at Exs. D, E.

12

The circumstances in this case are closer to those of *Hart* than *Vos*. While the first two officers to arrive—Mahoney and Martinez—were on the scene for just over two minutes before Novak exited his car and started advancing on them with the knife, for the first minute they did not know Novak had a knife. The officers were responding to a car accident involving a possibly intoxicated driver. It was not until Novak armed himself with the knife that the situation became more perilous. And when Novak exited the car and started toward the officers, they retreated for approximately 11 seconds, while ordering him to stop, as Novak brandished the knife and closed the gap between and them. At least some of the officers had been backed up close to one of the patrol vehicles.

Before and after Novak got out of the car, officers repeatedly warned him to drop the knife. As Novak exited his driver's side door holding the knife in his right hand by the handle, Mahoney also yelled, "Do you see my gun? Drop the knife." Doc. 30-1, JSUMF Nos. 47, 50; Doc. 30-2, Ex. D. To the extent plaintiffs argue that further warnings should have been given, "a warning is required only where feasible." *Hart*, 99 F.4th at 555 (internal quotations and citations omitted). Here, "given the speed at which the unfortunate events unfolded, it was not unreasonable for [the officers] to forgo a verbal warning and take action to protect" themselves from the immediate threat. *Id.*

It is also relevant "whether the officers were or should have been aware that [Novak] was emotionally disturbed." *Glenn*, 673 F.3d at 875. The parties agree that the officers "had no knowledge of his alleged mental illness." Doc. 30-1, JSUMF No. 65. Still, viewing the evidence in the light most favorable to plaintiffs, Novak exhibited clear signs of suicidal ideation, particularly once he repeatedly yelled "shoot me." And "[e]ven when an emotionally disturbed individual is acting out and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id.* at 876 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001)). But the officers had been trying to deescalate the situation and to calm Novak down. The incident escalated dramatically only when Novak left his car and headed toward the officers with the knife. After then backing

13

up and unsuccessfully ordering Novak to stop as he closed in on them, the officers were not required to "endanger their own lives by allowing [Novak] to continue in his dangerous course of conduct" merely because he "was intent on 'suicide by cop.'" *Est. of Hernandez by & through Hernandez v. City of Los Angeles*, 139 F.4th 790, 800 (9th Cir. 2025) (en banc) (quoting *Lal v. California*, 746 F.3d 1112, 1117 (9th Cir. 2014)).[7]

Under the totality of the circumstances, Martinez, Mahoney, and Lasso's conduct was not objectively unreasonable and they did not violate Novak's constitutional rights.

### ii.  Clearly Established Law

As the individual defendants did not violate Novak's constitutional rights, the Court need not consider whether the right at issue was "clearly established" at the time of the alleged misconduct.  *See Pearson v. Callahan*, 555 U.S. 223, 230–32 (2009).[8]

Therefore, the individual defendants are entitled to qualified immunity and summary judgment as to plaintiffs' § 1983 claim.

### 2.  *Monell* Claims

The City of Madera moves for summary judgment as to plaintiffs' *Monell* claims.  "A government entity may not be held liable under 42 U.S.C. § 1983, unless a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).  "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the

---

[7] Although Lasso had been dispatched earlier that evening to Novak's residence on an unrelated call, it is undisputed that Lasso did not recognize Novak at the car crash scene.  Doc. 30-1, JSUMF No. 65.  Nor were any of the other officers aware that Novak had prior contact with the Madera Police Department or aware of Novak's mental illness.  *Id.*

[8] In *Hart*, the Ninth Circuit found in factually similar circumstances that, while the officer did not violate the Fourth Amendment, he also did not violate clearly established law as of the December 2018 incident in that case.  *Hart*, 99 F.4th at 557.

14

constitutional violation.'" *Id.*

As the individual defendants did not violate Novak's constitutional rights, and plaintiffs' *Monell* claims are premised on such an underlying violation, defendants are also entitled to summary judgment as to the *Monell* claims.

**B. State Law Claims**

As the Court has granted summary judgment for defendants on plaintiffs' federal claims, only state-law causes of action remain. Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over related claims when it "has dismissed all claims over which it has original jurisdiction." In exercising this discretion, courts weigh the factors of "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc).

Although the case is at a relatively advanced stage, the remaining claims all arise under state law. Plaintiffs assert state law claims for negligence, battery, wrongful death, and violation of the Bane Act, all of which raise substantive issues appropriately addressed by the California courts. There have been no pretrial rulings directed specifically at the state claims, and the Court has not invested significant judicial resources in resolving them. On balance, the interests of comity and federalism favor allowing California courts to interpret and apply their own law on the state law claims. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n.7.

Accordingly, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3), and the remaining state-law claims are dismissed without prejudice to refiling in state court.[9]

---

[9] Section 1367(d) provides that when a federal court declines supplemental jurisdiction over a state law claim that formed part of the same case or controversy as the dismissed federal claims, the limitations period for the state law claim "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).

## IV.   Conclusion and Order

Accordingly:

1. Defendants' motion for summary judgment, Doc. 30, is GRANTED IN PART.  The motion for summary judgment is granted as to the federal claims in the First Amended Complaint (the First, Fourth, and Fifth Causes of Action).

2. The Court declines to exercise supplemental jurisdiction over the remaining state law claims (the Second, Third, Sixth, Seventh, and Eighth Causes of Action), and those claims are dismissed without prejudice to refiling in state court.

3. The Clerk of Court is directed to enter judgment in favor of defendants on the First, Fourth, and Fifth Causes of Action and to close this case.

IT IS SO ORDERED.

Dated:    January 16, 2026

_____
UNITED STATES DISTRICT JUDGE

16